**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RAMTIN SABET, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 16-cv-10783 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| THE CITY OF NORTH CHICAGO, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are Plaintiff's and Defendants' respective cross-motions for summary judgment. [57]; [64]. For the reasons set forth below, Defendants' motion for summary judgment [64] is granted in part and denied in part, and Plaintiff's motion for summary judgment [57] is denied. The case is set for further status on March 3, 2020 at 9:00 a.m.

**I.     Background**

The Court takes the relevant facts from the parties' Local Rule 56.1 statements of undisputed material facts and supporting exhibits: [57-1]; [59]; [66]; [68]; [79]; [86]. The Court construes the facts in the light most favorable to the nonmoving party on any given issue. The following facts are undisputed unless otherwise noted. "When we cite as undisputed a statement of fact that a party has attempted to dispute, it reflects our determination that the evidence cited in the response does not show that the fact is in genuine dispute." *King v. Chapman*, 2013 WL 6709623, at *3 (N.D. Ill. Dec. 16, 2013).

**A.     Parties and Overview**

Plaintiff Ramtin Sabet ("Plaintiff") was a police officer with the North Chicago Police Department (NCPD) from 2007 through 2017. [79 at 2, ¶ 3.] He also had a side job selling firearms.

See [*Id.* at 10, ¶ 23]. He immigrated to the United States from Iran in 1997, and is now an American citizen. [*Id.* at 1, ¶ 1.] He is also a practicing Muslim. [79 at 1, ¶ 2.] Plaintiff's race is white. [86 at 2, ¶ 3.] Plaintiff worked the late ("third") shift for the NCPD, which ran from 9:30 p.m. until either 6:00 or 6:30 a.m. [*Id.* at 3, ¶ 9.] He claims that he was subject to persistent harassment on account of his religion and national origin for his entire tenure at the police department. See [79 at 3, ¶ 6.]

Defendant James Jackson ("Jackson") was the chief of police for the NCPD from October 16, 2012 through April 30, 2016, when he retired. [86 at 2, ¶ 5.] Defendant Richard Wilson took over as chief of police on May 1, 2016. [*Id.* at 2-3, ¶ 7.] Prior to that, he was the deputy chief of police for the NCPD (at least beginning in September 2013). [*Id.* at 2, ¶ 5.] There were at least two layers of supervision between the deputy chief and officers such as Plaintiff: officers reported directly to sergeants, and sergeants were below lieutenants. See [79 at 5, ¶¶ 10–11.] Defendants argue that any harassment is aberrational given that the NCPD has adopted an anti-harassment policy and conducts diversity and inclusion training at least once a year. [86 at 3, ¶ 8]; [68-7]; [68-1 at 31–32.] The chief of police underwent additional diversity training quarterly. [68-16, 11.]

Unrelated to the central allegations of discrimination at issue in this lawsuit, Plaintiff had a professional rivalry with Sergeant Hartmann going back to 2009, when Hartmann tried to elicit support in an internal political debate and Plaintiff refused to side with him. [79 at 18, ¶ 44.] Since then, Plaintiff has always refused to side with Hartmann on internal matters. [*Id.*] Eventually, Sergeant Hartmann was promoted over Plaintiff, because Hartmann passed the sergeant exam whereas Plaintiff failed. [86 at 15, ¶ 43.] Officers Friel and Farrell, two of Plaintiff's primary adversaries on the third shift, were mentees of Hartmann. [*Id.* at 18–19, ¶ 45.] Officers sometimes refused to respond to Plaintiff's calls for backup. [79 at 19, ¶ 46]; [59-4 at 9]. It is unclear whether

the back-up problems are a manifestation of discrimination or an extension of the political rivalry with Hartmann. See [59-4 at 9]; [79 at 19, ¶ 46.]

The parties agree on the outline of what precipitated this lawsuit. On January 5, 2016, Plaintiff complained to his supervisor, Sergeant Val Nash (Nash) about harassment (discussed more below). [86 at 4, ¶ 13.] Plaintiff then implored his third shift colleagues to stop making derogatory comments. [*Id.* at 4–5, ¶¶ 13–14.] In response to his complaint, Jackson and Wilson initiated some sort of investigation into harassment on the third shift, though the parties dispute the scope and purpose of the investigation. [*Id.* at 5-6, ¶ 16.] Pursuant to this investigation, Plaintiff was interviewed in February 2016. [*Id.* at 6, ¶ 17]; [79 at 20, ¶ 48.] On April 20, 2016, Plaintiff filed an EEOC Charge of Discrimination alleging discrimination based on national origin and religion. [86 at 6-7, ¶ 18.] Two days later, the initial investigation completed, concluding that there was harassment on the shift, but that Plaintiff may not have been entirely forthcoming in the interview. [*Id.* at 8-9, ¶ 24.] In response to the investigation, Wilson asked the NCPD to investigate whether Plaintiff was untruthful in the interview. [*Id.* at 9, ¶ 25.] On November 2, 2016, Wilson placed Plaintiff on paid, administrative leave pending the investigation. [*Id.* at 12, ¶ 34.] On February 9, 2017, Plaintiff was fired; Defendants claim it is because he was not truthful during the investigation and another subsequent investigation. [*Id.* at 15, ¶ 42.] Plaintiff was hired as an officer for the Oakwood Hills Police Department. [79 at 26, ¶ 62.] Plaintiff was not decertified from testifying in court. [*Id.*]; [59-3 at 35].

Plaintiff filed suit in November 2016. His operative complaint [17] lists ten counts against the city and individual defendants: religious discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 *et seq.*, (Count I) [17, ¶¶ 73-78]; national origin discrimination in violation of Title VII (Count II) [*Id.*, ¶¶ 79-84]; retaliation in violation of Title

VII (Count III) [*Id.*, ¶¶ 85-90]; failure to provide training opportunities in violation of Title VII (Count IV) [*Id.*, ¶¶ 91-97]; a violation of his Fourteenth Amendment equal protection rights pursuant to 42 U.S.C. § 1983 (Count V) [*Id.*, ¶¶ 98-106]; retaliation in violation of the Fourteenth Amendment pursuant to § 1983 (Count VI) [*Id.*, ¶¶ 107-118]; municipal liability under *Monell* (Count VII) [*Id.*, ¶¶ 119-130]; discrimination in violation of the Illinois Human Rights Act, 775 ILCS 5/1-101, *et seq.* (Count VIII) [*Id.*, ¶¶ 131-34]; retaliation in violation of the Illinois Human Rights Act (Count IX) [*Id.*, ¶¶ 135-139]; and common law retaliatory discharge (Count X) [*Id.*, ¶¶ 140-51].

### B. Details of the Harassment

Plaintiff claims that he has long suffered harassment at the NCPD. [79 at 3, ¶ 6.] He filed his first EEO complaint in 2012, but it went nowhere, in part because Jackson, then the chief of police, fell asleep during the EEO interview. [*Id.*] Plaintiff was issued a right to sue letter, but declined to do so at that time. [*Id.* at 3, ¶ 8.] Plaintiff highlights the following specific incidents[1] of alleged harassment that have happened since then:

- In 2013, some officers dismissed Plaintiff as a "falafel-head" and told him to, "[g]o eat your falafel and hummus." [*Id.* at 12-13, ¶ 30.]

---

[1] Much of Plaintiff's facts concerning his harassment come from his affidavit, submitted as Exhibit B to his Local Rule 56.1 submission. Defendant argues that the Court should give no credence to these assertions because they are "self-serving." As the Seventh Circuit has "repeatedly emphasized over the past decade, the term 'self-serving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment." *McKinney v. Office of Sheriff of Whitley County*, 866 F.3d 803, 814 (7th Cir. 2017) (quoting *Hill v. Tangherlini*, 724 F.3d 965, 967 & n.1 (7th Cir. 2013)). Defendants' objections to Plaintiff's facts on this ground alone constitutes a blanket denial, and thus all of Plaintiff's facts regarding his harassment are deemed admitted. See, e.g., *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("[A] mere disagreement with the [] asserted facts is inadequate if made without reference to specific supporting material.") The Court views these facts in the light most favorable to the nonmovant on the respective cross-motions for summary judgment.

- In 2013, possibly at the same time, Officer Sain asked Plaintiff if he was eating "camel balls." [*Id.*]

- In 2014, at a work training at the firing range, a group of officers, including Sergeant Marquardt, Sergeant Rivera, and Detective Mueller, called Plaintiff a "fucking terrorist" and repeatedly accused him of being a member of Al-Qaeda. [*Id.* at 7-8, ¶ 16.]

- In 2014, at the same firearms training, Sergeant Hartmann, Officer Bogdala, and Officer Wail repeatedly asked Plaintiff why he had moved to the United States. [*Id.* at 7–8, ¶ 16(d).]

- Also in 2014, perhaps at the same time, a group of officers exclaimed that Plaintiff "rides his goat to work" and wears a winter hat made of camel wool. [*Id.* at 13, ¶ 31.] They then repeatedly asked him why he had moved to the United States. [*Id.*]

- On May 18, 2015, an officer asked if Plaintiff ate "goat balls." [*Id.* at 14, ¶ 32.]

- On May 19, 2015, Officer Farrell asked if Plaintiff had ever eaten "camel balls." [*Id.* at 14, ¶ 33.]

- On June 17, 2015, Officer Friel exclaimed that Plaintiff should never have gotten an FBI permit to sell firearms. [*Id.* at 8, ¶ 17.]

- On June 24, 2015, Officers Friel and Farrell called Plaintiff a "goat-fucker" in front of their superior officers. [*Id.* at 14-15, ¶ 34.]

- On July 2, 2015, Officer Friel accused Plaintiff of working for ISIS. [*Id.* at 8, ¶ 18.]

- On the same day, Officer Farrell asked Plaintiff if he had ever eaten camel meat and whether it had made him smarter. [*Id.* at 15, ¶ 35.]

- On July 15, 2015, Detective Mueller accused Plaintiff of working for ISIS. [*Id.* at 8-9, ¶ 19.]

- On July 17, 2015, during the Islamic holiday of Ramadan, Officer Farrell complained that "Obama allowed Muslims to put a green light on the Empire State Building for Ramadan." When Plaintiff questioned him about why this was a problem, Farrell responded that all Muslims kill Christians and provoke violence. [*Id.* at 9, ¶ 20.]

- On the same day, Officer Farrell opined to Plaintiff that "Iran should be nuked and wiped off the map." [*Id.* at 15, ¶ 36.]

- On the same day, Officer Farrell yelled "underjayee" at Plaintiff during the entirety of their shift because he had heard another Muslim person say it. [*Id.* at 9, ¶ 21.]

- On August 21, 2015, Officer Malak said that Plaintiff "eats sand for breakfast." [*Id.* at 15, ¶ 37.]

- On August 24, 2015, while out for a meal, Officers Farrell, Friel, and Malak asked Plaintiff, "What's with your people burning the American flag?" They then opined that the United States should nuclear bomb Iran and that "American solders * * * should just kill them all." [*Id.* at 16, ¶ 38.]

- On September 10, 2015, Officers Farrell and Friel repeatedly said that "all Muslims kill Christians and provoke violence.". [*Id.* at 9-10, ¶ 22.]

- On the same day, Officers Farrell and Friel repeatedly taunted Plaintiff that "Mohammed was a pimp and a child molester." [*Id.*]

- On the same day, Officer Friel told Plaintiff that all Muslims hate Jews. [*Id.*]

- On November 12, 2015 Officers Friel and Farrell taunted Plaintiff that he was eating "[c]amel's ass." [*Id.* at 16, ¶ 39.]

- On November 13, 2015, Officer Farrell called Plaintiff a terrorist and asked why he had been given a license to sell firearms. [*Id.* at 10, ¶ 23.]

- On December 14, 2015, Plaintiff asked Officers Friel and Farrell to refrain from discussing how the two officers had allegedly visited a brothel during a Fraternal Order of Police convention. The officers replied by taunting Plaintiff about their perception of the sexual mores in Iran and the Muslim world more generally. [*Id.* at 10, ¶ 24.]

- On January 5, 2016, Plaintiff complained to Sergeant Nash about the harassment. [86 at 4, ¶ 13.] She, in turn, relayed the complaint to her supervisors, who initiated an investigation into the alleged harassment. [*Id.* at 4–6, ¶¶ 13, 16.] Plaintiff addressed the third shift, asking them to stop the mocking. [*Id.* at 4–5, ¶ 14.] Friel asked if Plaintiff would stop making anti-Semitic comments (discussed more below), and Plaintiff responded ambiguously. [*Id.* at 5, ¶ 15]; [59-4 at 11.]

- On January 7, 2016, Officer Friel asked Plaintiff, hostilely, why Muslims are so violent and why they hate Jews. Friel then identified himself as part-Jewish. [79 at 10-11, ¶ 25.]

- That same day, Officer Friel again asked why Muslims hated Jews, and said explained that he did not hate Muslims and merely though that "Islam is bullshit and provoked violence." [*Id.* at 11-12, ¶ 27.]

- On the same day, Friel asked Plaintiff, "Why are your fucking people burning down the Saudi Arabian embassy in Iran?" [*Id.* at 16, ¶ 40.] Even though Plaintiff asked Friel to stop, he did not. [*Id.*]

- On the same day, Officer Farrell again questioned how Plaintiff had been given a license to sell firearms, and accused him of selling to terrorists. [*Id.* at 11, ¶ 26.]

- On January 14, 2016, Sergeant Rivera and Detective Mueller teased Plaintiff that he knew a particular Muslim pornographic actor. [*Id.* at 12, ¶ 28.]

- On the same day, Sergeant Rivera and Detective Mueller told Plaintiff to "go fuck your goats" and then publicly announced that "[Plaintiff] drinks goat milk and fucks his goats before coming to work." [*Id.* at 17, ¶ 41.]

- On January 28, 2016, in front of their superior officer, Officers Farrell and Friel accused Plaintiff of eating "goat balls," told him to not eat goat, complained of the smell of Plaintiff's food, and yelled, "durka durka durka," at him. [*Id.* at 17, ¶ 42.]

- On February 12, 2016, Plaintiff was interviewed by Lieutenant Theis, Sergeant Hartmann, and the city's attorney Ben Gehrt. [*Id.* at 20, ¶ 48.]

- In April 2016, a picture from the Sasha Baron Cohen movie "The Dictator," featuring Cohen in an outlandish beard, was posted to Plaintiff's locker. [*Id.* at 12, ¶ 29.]

- On April 20, 2016, Plaintiff filed an EEO complaint. [86 at 6–7, ¶ 18.]

- On April 21, 2016, someone graffitied Plaintiff's locker. The graffiti was explicit, depicting, among other things, an erect penis ejaculating onto Sabet's name and the city's seal, along with a puddle of ejaculate. [*Id.* at 7, ¶ 20; see also [59-6 at 11].

- On April 22, 2016, Gehrt concluded his investigation and found that Plaintiff's statements conflicted with those of several of his fellow officers. [86 at 8–9, ¶ 24.]

- Wilson then decided to further investigate Plaintiff. [*Id.* at 9, ¶ 25.]

- On July 12, 2016, Sergeant Rivera sent Plaintiff a notice that he was under investigation and would have to testify to what he said in February. See generally [68-15.]

- On July 31, 2016, Officer Florance opined that if Plaintiff were to get a tattoo, it would say "Bomb!" because he looked Middle Eastern (the "tattoo incident"). [79 at 17-18, ¶ 43.] A third-party consulting firm, REM Management Services (REM), was hired to investigate this incident. See [59-3 at 5–22].

- On August 27, 2016, Officer Farrell suggested that Plaintiff's Facebook profile picture looked threatening because he is Muslim (the "Facebook incident"). See generally [68-13]. REM was hired to investigate this incident. See generally [*id*.]

Plaintiff maintains that he was regularly taunted with slurs based on his religion and national origin at the firing range during firearms training. [79 at 5, ¶¶ 10–11.] Sergeant Rivera coordinated the outings, and Lieutenant Theis supervised the training. [59-1 at 33.] During these trainings, Plaintiff was regularly ridiculed by Sergeants Rivera and Marquadt and Detective Mueller. [*Id*.] Although Plaintiff repeatedly complained to Lieutenant Theis, Theis acknowledged the harassment on only one or two occasions. [79 at 5, ¶ 11.] After a certain point, Plaintiff stopped reporting the harassment, and would instead make knowing eye-contact with Theis as the harassment was happening, and Theis would simply turn around and ignore it. [59-1 at 33–34.] It is unclear whether Theis's one-time intervention ended the harassment for good, or whether it ended the harassment on that day, only to resume later. [79 at 5–6, ¶¶ 11–12.]

Defendants counter that the third shift had a "frat" dynamic. [86 at 4, ¶ 12.] As such, insofar as any coarse joking or "ribbing" did occur, it was just good-natured teasing. See [*id*. at 3, ¶ 10]. Plaintiff participated in this culture; for example, he called Officer Farrell, who is male, a "little lesbian." [*Id*. at 11, ¶ 31.] Also, when Plaintiff asked his third-shift colleagues to stop harassing him, Officer Friel accused Plaintiff of making anti-Semitic jokes.[2] [*Id*. at 5, ¶ 15.] Plaintiff denies these accusations. [86 at 5, 11, ¶¶ 15, 31.]

---

[2] Defendants point to other specific instances where Plaintiff allegedly denigrated Officers Friel and Farrell. But, they fail to cite any admissible evidence for these allegations; indeed, the sources they cite include hearsay, see [66, ¶ 33 (citing Sergeant Diez's testimony that Officer Friel made an out of court statement about Plaintiff)], and post-hoc reports prepared while this litigation was pending, [*id*. at ¶ 30 (citing internal memoranda, dated after Plaintiff had filed the instant lawsuit, that allege that Plaintiff mocked Officer Farrell, based on Farrell's out-of-court representations).] In his deposition, Plaintiff acknowledged making a comment to Farrell about HIV, but denies that he intended to imply that Farrell had HIV or lacked sexual

## C. Details of the Investigations

Plaintiff faults the investigation into his January 2016 complaint. He claims that the normal procedure for such investigations would be for him to be provided notice of a questioning, and the opportunity to bring an advocate of his choice. [79 at 20–21, ¶¶ 48–49.] Instead, he was simply told to report on February 12, 2016 to the chief's office, where he was interrogated about his own behavior. [*Id.* at 20, ¶ 48.] Rather than being allowed to choose his own advocate, his rival Hartmann was his advocate. [*Id.* at 21, ¶ 49.] He was confronted with accusations that he participated in the harassment of other officers, including that he made anti-Semitic comments to Friel. [*Id.* at 20, ¶ 48.] When the investigation report came out, it did not recommend any further action be taken against Plaintiff. [68-10 at 4,6.] Nonetheless, Wilson ordered an investigation into Plaintiff, and whether he told the truth during the February interview. [86 at 9, ¶ 25.] Even though Plaintiff identified Sergeant Rivera as one of his harassers, Rivera was tasked with investigating Plaintiff; according to Plaintiff, his objections to this went unheeded. [59-2 at 6)].[3]

Defendants largely object to this characterization of the investigation of the January 2016 complaint. From their perspective, they were simply performing due diligence—when Plaintiff complained about harassment, they talked to everyone on the third shift. [86 at 20–21, ¶ 48]; [68-10 at 2.] And regarding Sergeant Rivera's role in investigating Plaintiff, Wilson claims that he acknowledged this concern and hired the external firm, REM, to ensure there were no conflicts of

---

prowess. See [59-2 at 7–8.] Plaintiff's testimony is admissible, and the credence to be given to his denial is a matter for a factfinder.

[3] Plaintiff asserts that in June 2016, he was offered a deal to withdraw his April 20, 2016 EEO complaint in exchange for not being fired. [79 at 22, ¶ 51.] The evidence of this, however, is inadmissible—he testified that his union rep told him that Defendants told her the deal. [*Id.*] Plaintiff's recitation of the rep's out of court statement, offered for the truth of the matter asserted, is hearsay; it therefore cannot be used at this stage of litigation. Fed. R. Civ. P. 56. Moreover, Plaintiff attached an email from the union rep expressly rejecting the possibility of bargaining over the outstanding EEO complaint. [59-9 at 14.]

interest. [68-1 at 57–58.] Defendants also claim that they reacted promptly to Plaintiff's April 20, 2016 EEO complaint, sending a memo to all sworn officers reminding them of the NCPD's harassment policy. [86 at 9–10, ¶¶ 26–27.] The memo, dated April 25, 2016, was read at each shift's roll call for five days in a row.[4] [*Id.*]

Defendant hired REM to investigate the tattoo incident.[5] During the investigation, Florance said that the statement was taken out of context and that Plaintiff had baited him into saying the word "bomb." [59-3 at 8.] The investigation found that Plaintiff's version of the story was more plausible. See [*Id.*]; [79 at 17-18, ¶ 43.] It is undisputed that no corrective action was ever taken against Florance. [79 at 17–18, ¶ 43.]

Finally, the NCPD (and later REM) investigated the Facebook incident. When Officer Farrell mentioned Plaintiff's Facebook picture, Plaintiff countered that his profile was private, but then Farrell whipped out his phone and showed Plaintiff the Facebook picture. [68-13 at 6]; [*id.* at 18 ("When [Plaintiff] remarked that the Facebook page could only be seen by certain people, Farrell proved [Plaintiff] wrong by opening the Facebook page himself.")] Sergeant Rivera then interviewed Plaintiff about this incident. [*Id.* at 8–13.] During the interview, Plaintiff reiterated his confusion as to how Facebook's privacy and search settings work:

Ramirez: When did you block it?

Plaintiff: Oh, it's been blocked since…

Ramirez: Okay, so it's not public?

Plaintiff: For some reason it has been poppin' up because [Farrell] looked at it.

---

[4] Plaintiff disputes that the memo was read regularly, but does not cite admissible evidence in support of this objection, so it is deemed admitted.

[5] Neither party has briefed the admissibility of the REM reports, which are presumably larded with hearsay. That said, they may be admissible, at the very least, as evidence of their effect on third parties—Defendants allegedly made personnel decisions based on their content and recommendations. For simplicity's sake, the content of the reports is presented plainly.

Ramirez: Okay.

Plaintiff: But if you go, like, I can login and show you my settings…

Ramirez: Your settings…

Plaintiff: …Everything private says friends-friends-friends-friends, so I'm not sure why…

Ramirez: It's popping up though.

Plaintiff: It's popping up.

Ramirez: Okay

Plaintiff: And it's even in Farsi so it's not even in English, so I'm…

* * *

Ramirez: …you have it as blocked but it's poppin' up somehow.

Plaintiff: Yeah, I have it as blocked…

Ramirez: Okay.

Plaintiff: …but for some reason it's poppin' up.

[68-13 at 9.] REM subsequently investigated the Facebook incident, and concluded, among other things, that Plaintiff made two "inaccurate and untrue" statements during the investigation: that his Facebook profile was (a) private and (b) in Farsi. [*Id.* at 4.] REM accessed his Facebook page and noted that some of the page is in Farsi but "many other posts by him are in English." [*Id.*]

## II.    **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott*

*v. Harris*, 550 U.S. 372, 380 (2007). However, the Court will not draw inferences that are "supported by only speculation or conjecture," *Williams v. Brooks*, 809 F.3d 936, 944 (7th Cir. 2016) (quoting *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008)) (internal citations omitted), and "[c]onclusory allegations alone cannot defeat a motion for summary judgment." *Thomas v. Christ Hosp. & Med. Ctr.*, 328 F.3d 890, 892 (7th Cir. 2003). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).[6]

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Gibbs v. Lomas*, 755 F.3d 529, 536 (7th Cir. 2014) (quoting *Jewett v. Anders*, 521 F.3d 818, 821 (7th Cir. 2008)). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). To the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, including a fact that relies upon inadmissible hearsay, such a fact is disregarded. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

---

[6] Generally, the Court deals with cross-motions for summary judgment one at a time, construing all facts and drawing all reasonable inference in favor of the non-moving party. *Black Earth Meat Mkt., LLC v. Vill. of Black Earth*, 834 F.3d 841, 847 (7th Cir. 2016). To the extent that inferences could be made, the Court has made inferences in favor of the non-moving party on each issue.

"Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials that 'set forth specific facts showing that there is a genuine issue for trial.' " *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) (quoting Fed. R. Civ. P. 56(e)); see also *Anderson*, 477 U.S. at 250. A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex*, 477 U.S. at 323. The Court construes all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in favor of the nonmoving party. *Bell v. Taylor*, 827 F.3d 699, 704 (7th Cir. 2016).

## III.    Analysis: Defendant's Motion for Summary Judgment

Plaintiff brings three types of claims against Defendants: four claims under Title VII, three claims under § 1983, and three claims under Illinois law. Defendants have moved for summary judgment on all of them and seek to limit the applicability of punitive damages under two theories. Each of these issues is discussed in turn. In analyzing Defendants' motion, the Court interprets the facts in the light most favorable to Plaintiff.

### A.    Title VII Claims

Plaintiff has sued for four Title VII violations, many of which overlap. Counts I and II are for discrimination (including a hostile work environment) based on religion and national origin, respectively. Count III is for retaliation, and Count IV is for the denial of professional development opportunities. Defendants rightly point out that denial of professional development opportunities is not itself a cause of action. But, Plaintiff discussed the denial of trainings throughout the complaint, which is incorporated by reference into Counts I and II, so the Court may consider them

there. Count IV is redundant, and Defendant is entitled to summary judgment on it. Before turning to the substantive claims, however, the Court must first consider which parties are proper defendants for the Title VII counts and the timeliness of the various Title VII claims.

### 1. Individual Liability

Defendants Jackson and Wilson argue that they are entitled to summary judgment on the Title VII counts because Title VII does not impose individual or supervisor liability; that is, only an "employer" [7] meeting the statutory definition can properly be sued, and they do not fit that definition. Plaintiff counters that this rule does not apply to Title VII cases and, in the alternative, that the statutory definition of "employer" applies to the individual Defendants because it discusses "agent[s]" of the employer or contemplates liability for supervisory employees.

As the Seventh Circuit has explained, "Title VII, the ADA, and the Age Discrimination in Employment Act ('ADEA') use virtually the same definition of 'employer,' and that '[c]ourts routinely apply arguments regarding individual liability to all three statutes interchangeably.'" *Williams v. Banning*, 72 F.3d 552, 553–54 (7th Cir. 1995) (quoting *U.S. E.E.O.C. v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1280 (7th Cir. 1995)) (footnote omitted). After reviewing the definition of employer in all three statutes and the relevant caselaw, the Seventh Circuit held that "individuals who do not otherwise meet the statutory definition of 'employer' cannot be liable under the ADA." *AIC*, 55 F.3d at 1282. It then extended the logic of this opinion to Title VII cases, holding that the respective statutory definitions of employer were indistinguishable. *Williams*, 72 F.3d at 554. Thus, there is not independent individual liability for supervisors—at least when plaintiffs do not bring any novel and persuasive distinguishing argument. *Id.*

---

[7] "Title VII defines 'employer' as 'a person engaged in an industry affecting commerce who has fifteen or more employees ... and any agent of such a person[.]'" *Williams v. Banning*, 72 F.3d 552, 553 n.1 (7th Cir. 1995) (citing 42 U.S.C. § 2000e(b)).

Jackson and Wilson are not proper defendants for Counts I–III. Plaintiff's arguments are contrary to *Williams* and *AIC*. First, *Williams* extended *AIC* to Title VII cases, and refused to distinguish the two definitions of employer. *Id.* Second, *Williams* parsed the "agent" language that Plaintiff highlights and explained that that language provides an alternative basis for *employer* liability, not *employee* liability. *Id.* at 555. Third, having hiring and firing authority or being at the top of an organizational structure does not make someone an "employer." Compare *AIC*, 55 F.3d at 1279, 1282 (holding that a sole shareholder who ran the company "on a day-to-day basis" and fired plaintiff is not an "employer"), with *id.* at 1280 n.2 (explaining that a "sole proprietor" is conceivably an employer). Here, neither of the individual Defendants are employers and thus cannot be sued under Title VII; they are thus entitled to summary judgment as to these three counts.

### 2.     Timeliness

Generally speaking, "Title VII claims must be filed within 180 or 300 days after the allegedly discriminatory act, depending on the state. In Illinois, the charging period is 300 days." *Groesch v. City of Springfield, Ill.*, 635 F.3d 1020, 1024 n.2 (7th Cir. 2011) (citations omitted). Plaintiff's operative EEOC complaint was filed on April 20, 2016. Defendant argues that any evidence of discrimination that occurred before June 26, 2015 (300 days prior) should be disregarded as time barred. Plaintiff counters that, at the very least, evidence of a hostile work environment from before the 300-day window can be considered as part of an ongoing violation.

Although discrete adverse actions taken before June 26, 2015 are time barred, Plaintiff may present evidence of harassment that occurred before then for the purpose of his hostile work environment theory. As the Supreme Court explained:

> A hostile work environment claim is composed of a series of separate acts that collectively constitute one "unlawful employment practice." 42 U.S.C. § 2000e–5(e)(1). The timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened. It does

not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

*National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002); see also *Pruitt v. City of Chicago, Illinios*, 472 F.3d 925, 927–28 (7th Cir. 2006) (explaining that laches is the appropriate defense to invoke when plaintiffs tarry in bringing hostile work environment claims). The case that Defendants cite for the proposition that evidence of a hostile work environment outside of the 300-day window must be suppressed rested its holding on the fact that the plaintiff "failed to provide any dates of these alleged discriminatory acts and instead simply indicated that they occurred regularly and consistently," so the court could not conclude that they were part of a single employment practice. *Zepeda v. Cook County, Ill.*, 980 F.Supp.2d 1015, 1029 (N.D. Ill. 2013). Here, however, Plaintiff has provided an extensive inventory of specific instances during which harassment occurred, dating back to 2013, and testified that he was regularly harassed during firearms training, providing further continuity. Because the hostile work environment was an ongoing violation, and many of the component acts occurred within the 300-day window, Plaintiff may present older evidence of the hostile work environment. *Morgan*, 536 U.S. at 117.

### 3.     Denial of Training, Non-promotion, and Termination

"Title VII makes it unlawful for an employer to discharge or discipline an employee because of that person's race or sex, among other grounds." *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012). Likewise, failure to promote claims are actionable, as are claims related to the failure to provide access to professional development opportunities. See *Borja v. Shulkin*, 2018 WL 6725565, at *4 (N.D. Ill. Dec. 21, 2018); see also generally *Johnson v. McDonald*, 2020 WL 374679 (N.D. Ill. Jan. 23, 2020).

Preliminarily, neither party recites the proper standard for summary judgment in employment discrimination cases. That is, four years ago, the Seventh Circuit revisited its employment discrimination jurisprudence and rejected the "convincing mosaic" framework, along with the accompanying requirement that "direct" and "indirect" evidence be considered separately. See generally *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016). The Seventh Circuit has subsequently explained the proper standard:

> "[T]he singular question that matters in a discrimination case is: '[W]hether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.' " *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018) (quoting [*Ortiz*, 834 F.3d at 765]). To present this evidence, a plaintiff may utilize the *McDonnell Douglas* "burden-shifting framework." *David v. Board of Trustees of Cmty. College Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). "Under this approach, the plaintiff must show evidence that '(1) she is a member of a protected class, (2) she was meeting the defendant's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not members of her protected class were treated more favorably.' " *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 719 (7th Cir. 2018) (quoting *Carson v. Lake County, Ind.*, 865 F.3d 526, 533 (7th Cir. 2017)). "If the plaintiff meets each element of her prima facie case, 'the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual.' " Id. at 719–20 (quoting *Carson*, 865 F.3d at 533).
>
> Notably, the *McDonnell Douglas* framework is not the only method plaintiffs may use to prove their claim. "[It] is merely one way of culling the relevant evidence needed to demonstrate whether a reasonable factfinder could conclude that an employer engaged in an adverse employment action based on the plaintiff's" age or another proscribed factor. *Johnson*, 892 F.3d at 894. "However the plaintiff chooses to proceed, at the summary judgment stage the court must consider all evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse employment action because of her age." *Skiba*, 884 F.3d at 720 (quoting *Carson*, 865 F.3d at 533) (emphasis in the original). We therefore also assess the evidence "as a whole, rather than asking whether any particular piece of evidence proves the case by itself." *Ortiz*, 834 F.3d at 765.

*McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 367–68 (7th Cir. 2019). Under the *Ortiz* framework, summary judgment is inappropriate if a reasonable finder could find "either a

causal connection between [Plaintiff's activity or status] and the adverse action he suffered or else support an inference of retaliatory [or discriminatory] motive." *McDaniel*, 940 F.3d at 371 (quoting *Lewis*, 909 F.3d at 871).

Here, Plaintiff alleges three discrete adverse actions—(a) the failure to provide adequate professional development opportunities, (b) the failure to promote, and (c) his dismissal. Plaintiff's failure to provide trainings and failure to promote arguments are nonstarters. With regard to failure to train, there is no evidence from which a reasonable fact-finder could conclude that Plaintiff was not provided with adequate training opportunities *because of his protected status*. Indeed, Plaintiff *admits* that he was denied training because of internal politics, *not* discrimination. [59-2 at 38, ¶ 37.] In light of this admission, no reasonable jury could conclude that Plaintiff's lack of training was actionable as religious or national-origin discrimination. *Skiba*, 884 F.3d at 720. Moreover, it appears as though the denial of trainings claim is time barred. See [79 at 27, ¶ 67 (alleging that Plaintiff complained in April 2015 of his lack of trainings).] And Plaintiff's non-promotion claim must fail as well, because it is undisputed that successful applicants must pass the sergeant's exam, and Plaintiff did not pass the exam, meaning that he did not meet the minimum threshold for promotion. [86 at 15, ¶ 43]; [66-19 at 66:9–10 ("Q: Did you ever pass the sergeant exam? A: No.")] No reasonable jury could conclude that his non-promotion was actually because of his religion or national origin. *Skiba*, 884 F.3d at 720.

His wrongful termination theory, however, may proceed. The Court begins (and ends) with the *McDonnell Douglas* burden-shifting framework. Defendant only disputes two prongs of Plaintiff's prima facie case: (1) that he was treated less favorably than a similarly situated employee and (2) that Plaintiff met his employer's legitimate job expectations.

First, Defendant argues that Plaintiff cannot meet the similarly situated prong because he cannot point to another similarly situated employee who lied during an investigation and was not fired. "Although similarly situated employees need not be identical in every conceivable way, they must be directly comparable to the plaintiff in all material respects." *McDaniel*, 940 F.3d at 368–69 (citations and quotation marks omitted). "In the usual case a plaintiff must at least show that the comparators (1) 'dealt with the same supervisor,' (2) 'were subject to the same standards,' and (3) 'engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Coleman*, 667 F.3d at 847 (quoting *Gates v. Caterpillar*, 513 F.3d 680, 690 (7th Cir. 2008)). "Whether a comparator is similarly situated is typically a question for the fact finder, unless, of course, the plaintiff has no evidence from which a reasonable fact finder could conclude that the plaintiff met his burden on this issue." *Johnson*, 892 F.3d at 895 (citations omitted). Here, Plaintiff can point to, at least, Officer Florance as a similarly situated comparator who was treated more favorably than Plaintiff and subject to the same standards as a member of the NCPD under Wilson's command. A third party, REM, investigated the tattoo incident and found that Plaintiff's allegations were more plausible that Florance's version(s) of the story. Indeed, viewing the record in the light most favorable to Plaintiff, Florance's answers were evasive and shifted over time, meaning that at some point he did not speak truthfully. Yet, *no* corrective action was taken against Florance for providing inaccurate and misleading information during an investigation. [79 at 17–18, ¶ 43.] Thus, Plaintiff has adduced evidence from which a reasonable jury could conclude that the two engaged in similar conduct yet were treated differently. *Johnson*, 892 F.3d at 895.

Second, whether an employee meets his employer's legitimate expectations often bleeds into pretext. See, *e.g.*, *McKinney v. Office of Sheriff of Whitley County*, 866 F.3d 803, 810–13 (7th

Cir. 2017) (interweaving analyses of (a) whether employee met employer's expectations, (b) employer's supposed justifications for adverse action, and (c) pretext); *Flores v. Preferred Technical Group*, 182 F.3d 512, 515 (7th Cir. 1999). That is, a Title VII defendant cannot point to a pretextual reason for terminating the plaintiff to defeat a plaintiff's prima facie case and thus skirt the pretext analysis altogether. See *Pilditch v. Board of Educ. of City of Chicago*, 3 F.3d 1113, 1117 (7th Cir. 1993) ("But this alone cannot derail the plaintiff's case at this stage, because anytime an employer fired or demoted someone (as in every Title VII case of this kind), it would prove that the employee was not meeting expectations; the requirement, then, would be meaningless.") At this stage in the burden-shifting process, the question is simply "whether the employee is able to put on objective evidence that he is sufficiently competent to satisfy the legitimate expectations of an employer." *Id.*; see also *McKinney*, 866 F.3d at 813 (same). Here, Plaintiff has done so. Preliminarily, he has shown that he was hired by another police department, see [59-3 at 35], which may be enough to demonstrate his competence in and of itself. See *Pilditch*, 3 F.3d at 1117. Moreover, Plaintiff has shown that his most recent supervisors praised his performance. [59-3 at 27 (explaining that Plaintiff scored well on one of the only recent performance evaluations)]; [68-18, 18:10–13 ("Q: While you were his supervisor * * * were there complaints made against [Plaintiff] by other officers? A: No."); [*id.*, 22:18–21 ("Q: [] Do you recall having any—or having any performance issues with [Plaintiff]? A: No. I—[Plaintiff] was a good police officer. He—he—his productivity was—was excellent.")]. Thus, a reasonable jury could conclude that he satisfied his employer's reasonable expectations because he was viewed "a good police officer" by his supervisor at NCPD at the time of termination. Finally, as explained above, there is at least some other evidence that other officers lied, obfuscated, or stonewalled during investigations and had no corrective taken, suggesting that he "was singled out for discipline based on a prohibited

factor." See, *e.g.*, *Ismail v. Brennan*, 654 Fed. Appx. 240, 243 (7th Cir. 2016) (quoting *Curry v. Menard, Inc.*, 270 F.3d 473, 477 (7th Cir. 2001)) (loosening the standard for demonstrating competence when plaintiff presents evidence of being singled out).

Defendant holds up its end of the burden-shifting framework by pointing to facially non-discriminatory reasons for his firing—his supposed lying during these investigations. So, the burden shifts back to Plaintiff to show that this was pretexual. Pretext "means something worse than a business error; pretext means deceit to cover one's tracks." *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 684 (7th Cir. 2000). Defendant's supposedly legitimate justification must be shown to be "a lie." *Widmar v. Sun Chemical Corp.*, 772 F.3d 457, 464 (7th Cir. 2014). A plaintiff demonstrates pretext "directly by persuading the court that a discriminatory reason more likely motivated the [defendant] or indirectly by showing that the [defendant's] proffered explanation is unworthy of credence." *Blise v. Antaramian*, 409 F.3d 861, 867 (7th Cir. 2005) (citing *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). To undermine the credibility of a justification, a plaintiff "must identify such weaknesses, implausibilities, inconsistencies, or contradictions in the defendant's proffered reasons that a reasonable person could find them unworthy of credence and hence infer that the defendant did not act for the asserted non-discriminatory reasons." *Widmar*, 772 F.3d at 465. "One can reasonably infer pretext from an employer's shifting or inconsistent explanations for the challenged employment decision." *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 738 (7th Cir. 2013) (quoting *Rudin*, 420 F.3d at 726). Likewise, deviations from "normal practice" and "unexplained missing records" are suggestive of pretext. See *Baines v. Walgreen Co.*, 863 F.3d 656, 664–65 (7th Cir. 2017). That said, the Court must not act as a "super-personnel department that second-guesses employer

policies that are facially legitimate," and must therefore restrict its inquiry into whether the proffered reasons for non-selection are pretextual. *Widmar*, 772 F.3d at 464.

A reasonable jury could conclude that the two supposed reasons for the firing—Plaintiff's alleged lies about making anti-Semitic comments and Plaintiff's statements about his Facebook— are pretextual. For starters, a reasonable jury could easily view the Facebook justification as incredible. Even taking the REM report at face value, Plaintiff repeatedly acknowledged that people outside of his friends and family could search for him and view the profile—that he kept on "popping up." Acknowledging that the profile is viewable by third parties (who presumably searched for him in English) is consistent with the investigator's findings that his profile was public, and portions were in English. In fact, it is hard to square REM's conclusion that Plaintiff lied with the supposedly offending transcript. Moreover, the report was finalized in January 2017, months after Plaintiff had filed suit. See [68-13 at 1.] Viewing the Facebook investigation in the light most favorable to Plaintiff, a reasonable jury could easily conclude that Defendant "lied" that this was why Plaintiff was fired. *Widmar*, 772 F.3d at 464.

Beyond the Facebook incident, there are other inconsistencies from which a factfinder could infer pretext. First, the initial February 2016 interview—from which no records have been uncovered—apparently deviated from normal protocols insofar as Plaintiff was not informed in advance that he was under investigation for harassment and was not given his choice of advocate. Defendant's definitive reliance on such a non-conforming and undocumented interview is suggestive of pretext. *Baines*, 863 F.3d at 664–65. Second, at least one other officer at the very least stonewalled—if not lied—during an investigation into religious harassment, yet no corrective action was taken, suggesting that full-blown investigations into inconsistencies is a deviation from normal practice. *Id.*; *cf. Hitchcock*, 718 F.3d at 738. Third, relatedly, this suggests that by the

NCPD's own standards, Plaintiff's punishment was inconsistent. *Widmar*, 772 F.3d at 465. Fourth, the initial investigation that uncovered the inconsistency regarding Plaintiff's alleged anti-Semitism did not call for further investigation of Plaintiff, suggesting that the decision to further investigate his statements reached outside of normal protocols. *Baines*, 863 F.3d at 664–65. Fifth, the decision to terminate Plaintiff because his supposed mendacity was so severe that no progressive discipline could appropriately remedy the problem is inconsistent with the NCPD's failure to decertify him. *Widmar*, 772 F.3d at 465. That is, if he is a liar, then why continue to allow him to testify in cases where criminal defendants' lives and limbs are in jeopardy? Finally, Defendant's repeated reliance on the Facebook report suggests its explanations are generally "unworthy of credence." *Blise*, 409 F.3d at 867. In sum, Plaintiff may proceed with his discriminatory termination theory.

### 4. Retaliation

Title VII retaliation claims are similar to discrimination claims: Plaintiff may show that he was retaliated against directly by showing evidence of causation, or indirectly under the *McDonnell Douglas* framework. *McDaniel*, 940 F.3d at 370. Here, Plaintiff's claims survive summary judgment via the *McDonnell Douglass* framework for the reasons laid out above. He (a) engaged in protected activity (complaining about the harassment); (b) suffered an adverse employment action, (c) met his employer's legitimate job expectations, and (d) was treated less favorably than a similarly situated employee. *Id.* at 370–71; section III(A)(3), supra. Although Defendant can point to Plaintiff's alleged lies, a reasonable jury could find the firing pretextual for the reasons explained above.

The Court notes, however, that the evidence of retaliation is, if anything, stronger than that of discrimination. Here, there is evidence that NCPD higher-ups harbored retaliatory animus based

on Plaintiff's prior EEO activity. [59-2 at 38, ¶ 38.]. A reasonable jury could also infer retaliatory motive from the fact that two of the few times that Defendant ever took remedial action regarding violations of NCPD policies was against the person who made the initial complaints, notwithstanding the fact that both times the complaint was substantially sustained. Thus, Plaintiff may proceed with his retaliatory discharge theory.

### 5.     Hostile Work Environment

To succeed on hostile environment[8] claim, a plaintiff must demonstrate that: "(1) he was subject to unwelcome harassment; (2) the harassment was based on race (or another protected category); (3) the harassment was severe or pervasive to a degree that altered the conditions of employment and created a hostile or abusive work environment; and (4) there is a basis for employer liability." *Robinson v. Perales*, 894 F.3d 818, 828 (7th Cir. 2018). Defendant argues that the harassment was neither severe nor pervasive[9] and there is no basis for employer liability. Plaintiff counters that the harassment qualifies as offensive, severe, and pervasive.

First, a reasonable jury could conclude that the harassment was severe or pervasive. "The requirement is disjunctive, not conjunctive; the standard may be met by a single extremely serious act of harassment or by a series of less severe acts." *Robinson*, 894 F.3d at 828. The severity and

---

[8] Plaintiff has alleged a hostile work environment based on his religion and national origin. It is frequently unclear whether and when a particular incident in this case counts as religious harassment, national-origin harassment, or both. For example, Plaintiff was frequently called a terrorist, Al Qaeda leader, and ISIS member—all of those could be plausibly interpreted as references to his religion or national origin. Likewise, some taunts that reference religion (such as those related to the Muslim pornography actor) were paired with others that seem to fall closer to national origin (calling Plaintiff a "goat-fucker.") Accordingly, the Court views the evidence of both in tandem. See *Huri v. Office of the Chief Judge of the Circuit Court of Cook County*, 804 F.3d 826, 834 (7th Cir. 2015) (allowing national-origin (Saudi Arabia) hostile work environment claim to proceed, although the harassment only explicitly discussed Islam).

[9] Some cases look "instead for evidence that the workplace was both subjectively and objectively offensive," but in the end "the inquiry is the same." *Johnson*, 892 F.3d at 900. Because Defendant frames its arguments in terms of subjective offensiveness, the Court will address the extent to which the harassment interfered with Plaintiff's conditions of employment under the framework of subjective offensiveness as well.

pervasiveness of harassment are highly context dependent, and factors include "'the severity of the alleged conduct, its frequency, whether it [wa]s physically threatening or humiliating (or merely offensive), and whether it unreasonably interfere[d] with the employee's work performance.'" *Gates v. Board of Education of the City of Chicago*, 916 F.3d 631, 637 (7th Cir. 2019) (quoting *Robinson*, 894 F.3d 828). Accordingly, "[w]hether harassment was so severe or pervasive as to constitute a hostile work environment is generally a question of fact for the jury." *Johnson v. Advocate Health and Hospitals Corporation*, 892 F.3d 887, 901 (7th Cir. 2018) (citations omitted). Even work environments that are "a far cry from hellish" are actionable, but "[o]ffhand comments, isolated incidents, and simple teasing" are not. *Id.* at 901, 902. Harassment from one's supervisors is more severe than that from one's peers. *Gates*, 916 at 638–41 (collecting cases and concluding that a supervisor's use of the N-word multiple times could have created a hostile work environment). Likewise, direct harassment (when the conduct is directed at the plaintiff) is more severe than indirect harassment (a milieu in which people utter offensive things, but not directly to the plaintiff). *E.g.*, *Russell v. Board of Trustees of University of Illinois at Chicago*, 243 F.3d 336, 343 (7th Cir. 2001).

Here, several reported incidents of harassment (including one of the most severe) came from Plaintiff's superior officers. Sergeant Rivera accused Plaintiff of bestiality in the context of insinuating that Plaintiff knew a Muslim sex worker.[10] This accusation crosses the line from merely

---

[10] Defendant's attempt to analogize this case to *Filipovic v. K & R Express Systems, Inc.*, 1997 WL 790593 (N.D. Ill. Dec. 17, 1997), is unavailing. In *Filipovic*, the court only identified a handful of incidents of harassment, one of which was that the plaintiff was called a "stupid asshole," which the court disregarded. *Id.* at *15. *Filipovic* also disregarded another insult, that the plaintiff was a "sheep fucker," because it did not clearly reference the plaintiff's Yugoslavian heritage. *Id.* Even if the Court could apply such logic to general accusations of bestiality here, the accusations of bestiality were paired with more explicit invocations of national origin (camels) and religion (the Muslim pornographic actor), respectively, permitting the inference that they were tied to protected status. *Cole v. Board of Trustees of Northern Illinois University*, 838 F.3d 888, 896 (7th Cir. 2016) (explaining that "forms of harassment that might seem neutral in terms of [protected status] can contribute to a hostile work environment if other evidence supports a

offensive to "humiliating," especially as it came from Plaintiff's supervisor. *Gates*, 916 F.3d at 637. Moreover, this particular comment came just a few weeks after Plaintiff begged his shift to stop the harassment and formally complained—that is, *during* the investigation of Plaintiff's complaints. Of course, the fact that a supervisor made a series of humiliating jabs at Plaintiff soon after he had publicly asked people to stop and while the NCPD was investigating harassment suggests that harassment at the NCPD was sufficiently pervasive that an internal affairs investigator would not even think twice about it. This was not the only incident of harassment from Plaintiffs' supervisors: Sergeants Marquardt and Rivera repeatedly called him a terrorist and Al-Qaeda operative at firearms training. In this context, Sergeant Harmann repeatedly asked why he moved to the country, suggesting that Plaintiff did not belong in the United States and that he ratified the other sergeants' taunts. Plaintiff avers that these sergeants' conduct has recurred over years.

In terms of the other abuse, almost all of the alleged harassment was "direct," further suggesting workplace hostility. *Russell*, 243 F.3d at 343. These other incidents may not, on their own, be so serious as to create a hostile environment, but taken together could permit a jury to infer that Plaintiff was subject to severe or pervasive hostility. For example, the officers' repeated comments about killing all Iranians, combined with their penchant for blaming Plaintiff for stuff other Iranians did, could be viewed as threatening, especially in light of some officers' refusal to back Plaintiff up. *Gates*, 916 F.3d at 637. And, the sexually explicit graffiti can be attributed to religious or anti-Iranian animus, *Cole*, 838 F.3d at 896, and is on the more serious side of workplace misconduct. Cf. *Baskerville v. Culligan Intern. Co.*, 50 F.3d 428, 430 (7th Cir. 1995)

---

reasonable inference tying the harassment to the plaintiff's protected status"). The decision in *Filipovic* granting summary judgment for the employer is also inapposite—there were only four incidents of harassment, and the most serious ones did not come from the plaintiff's supervisors. See *Filipovic*, 1997 WL 790593 at *15.

(explaining that "obscene language or gestures [and] pornographic pictures" are actionable in and of themselves, at least in sex discrimination cases). At some point short of the dozens of incidents here—many of which involve vivid denigration of his religion, including that its ultimate prophet is a "pimp" and "child molester," and the regular accusations of terrorism and bestiality—give way from a few "isolated incidents" of teasing to a hostile work environment. See, *e.g.*, *Vovillia v. Illinois Department of Human Services*, 2019 WL 2994533, at *8 (N.D. Ill. July 9, 2019).

Defendant argues in response that the harassment could not be severe and pervasive, because Plaintiff was not subjectively offended, as evidenced by his participation in the ribbing. Preliminarily, Plaintiff disputes whether (and to what extent) he made comments about other officers; if the jury believes his testimony over that of his former coworkers, then Plaintiff never said anything anti-Semitic in the first place. And, at least in this motion, Defendants have offered meagre admissible evidence of Plaintiff's allegedly rampant anti-Semitism. There is also evidence from which a reasonable jury could conclude that Plaintiff was actually offended, and the harassment materially altered the conditions of his employment. He filed at least three formal complaints in 2016 and begged his coworkers to stop. He also sought counseling from his imam on a bi-weekly basis.[11] [59-2 at 24.] And between 2013 and late 2016—before he was fired—he sought medical treatment for stress-related stomach pain, which intensified throughout the spring of 2016. [79 at 32, ¶ 77]; [59-2 at 26–27.] Likewise, "the harassment interfered with [Plaintiff's] work performance by making it difficult for him to concentrate and by forcing him to devote time to making verbal complaints to his supervisors, submitting [written complaints], and participating

---

[11] Defendant argues that because Plaintiff never sought psychological counselling, he cannot prevail on his hostile work environment claim. But, it is well established "that 'Title VII comes into play before the harassing conduct leads to a nervous breakdown.'" *Cerros v. Steel Technologies, Inc.*, 288 F.3d 1040, 1046 (7th Cir. 2002) (*Cerros I*) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 22 (1993).

in investigations when he could otherwise have been performing his assigned duties." *Vovillia*, 2019 WL 2994533, at *8.

Finally, neither party adequately addressed the proper standards for determining whether there is a basis for employer liability. The standards differ based on the role of the harasser within the organization: "If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions. In cases in which the harasser is a 'supervisor,' however, different rules apply." *Vance v. Ball State University*, 570 U.S. 421, 424 (2013). Defendant has not addressed the fact that some of the harassment came from Plaintiff's supervisors, which would generally impose strict liability. *Id.* Of course, there are exceptions to this rule, see, *e.g.*, generally *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), and "supervisor" is a term of art when determining employer liability. *Vance*, 570 U.S. at 431 ("We hold that an employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered that employee to take tangible employment actions against the victim, *i.e.*, to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.") (quotation marks and citation omitted). But Defendant has not fleshed out arguments under any framework and has thus failed to meet its burden of demonstrating that it is entitled to judgment as a matter of law.

Even if Sergeants and Detectives are considered coworkers, however, a reasonable jury could still determine that Defendant was negligent in stemming and responding to Plaintiff's harassment. "An employer satisfies its legal duty in coworker harassment cases 'if it takes reasonable steps to discover and rectify acts of ... harassment of its employees.'" *Cerros v. Steel Technologies, Inc.*, 398 F.3d 944, 952 (7th Cir. 2005) (*Cerros II*) (quoting *Parkins v. Civil*

*Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir.1998)). "An employer's adoption of an effective anti-harassment policy is an important factor in determining" the reasonableness of its actions. *Hunt v. Wal-Mart Stores, Inc.*, 931 F.3d 624, 630 (7th Cir. 2019) (citation omitted) (finding no basis for employer liability where policy included "robust" reporting measures and employer promptly investigated reported conduct). The "mere existence of such a policy, however, does not necessarily establish that the employer acted reasonably in remedying the harassment after it has occurred or in preventing future misconduct." *Cerros II*, 398 F.3d at 953 (citations omitted); see also *Hunt*, 931 F.3d at 630 ("[P]revention should include close monitoring when an employer has knowledge of prior harassment.") Indeed, employees need not always follow the exact reporting requirements in a policy—what matters is whether they complain about the harassment in a way that should bring it to the employer's attention. *Cerros II*, 398 F.3d at 953.

Here, Defendant's anti-harassment policy was ineffective, and, in any event, Defendant failed to adequately respond to prior reports of harassment. First, the anti-harassment policy, such as it is,[12] merely requires that any employee experiencing harassment or discrimination "to notify promptly their supervisor or Human Resources. This may be done in writing or orally." [68-7 at 4]; see also [*id.* at 2 ("Any employee with questions or concerns about any type of discrimination in the workplace is encouraged to bring these issues to the attention of their supervisor or Human Resources.")]. Plaintiff repeatedly reported harassment to Lieutenant Theis, yet Theis did nothing. If an employer can be liable for coworker harassment when the victim does not comply with a policy's reporting requirements, *Cerros II*, 398 F.3d at 953, then *a fortiori* the NCPD should be liable here, where Plaintiff *did* comply with the policy. Moreover, Defendant does not dispute that

---

[12] The policy is difficult to parse and appears to have been cobbled together from an older policy that did not discuss religion and national origin. Section 1.7, the only full section of the policy provided to the Court is entitled "Sexual Harassment." See generally [68-7]. Except for one paragraph, the two-page policy focuses exclusively on "harassment based on gender." [*Id.* at 2.]

it had knowledge of Plaintiff's 2012 complaint, yet it failed to monitor to ensure that the harassment problems did not pop up again. This failure to monitor was especially problematic given that the culture of harassment was well-known by the supervisory sergeants and Lieutenant Theis; indeed, these facts are suggestive of a total breakdown of the anti-harassment program. And, there is at least some suggestion that the officers' refusal to back Plaintiff up was discriminatorily motivated—perhaps an investigation into this dangerous personnel and public safety problem would have uncovered further evidence of the dysfunction and harassment on the third shift. In other words, viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Defendant failed to take "reasonable steps to discover and rectify acts of ... harassment" given that Plaintiff followed the anti-harassment policy to no avail, and the existence of harassment was well known by staff and management alike. *Cerros II*, 398 F.3d at 952. Thus, Defendants are not entitled to summary judgment on this claim.

### B.     Section 1983 Claims

Plaintiff brings two § 1983 claims against Jackson and Wilson in their individual and official capacities for discrimination and retaliation in violation of the Fourteenth Amendment. Plaintiff also has a *Monell* count for municipal liability. Defendants have moved for summary judgment on the following grounds, which are addressed in turn: Plaintiff's official capacity counts against the individual counts are redundant; Plaintiff's retaliation claim fails as a matter of law; Jackson cannot be held personally liable under § 1983 because he retired and was not personally involved in any discrimination; the city cannot be held liable under *Monell*; and the remaining discrimination claim should be analyzed as similar to the Title VII claims.

### 1. Official Capacity Claims

Defendants Jackson and Wilson move for summary judgment on the official capacity claims brought against them on the grounds that they are redundant in view of the *Monell* claims. That is, a suit against an "official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989) (internal citations omitted). Because there is authority that such redundant claims should be dismissed, *Admiral Theatre v. City of Chicago*, 832 F. Supp. 1195, 1200 (N.D. Ill. 1993), and Plaintiff does not address Defendants' arguments, Defendants Jackson and Wilson are entitled to summary judgment as to the § 1983 claims against them in an *official capacity*.

### 2. Retaliation Claim

Defendant has also moved for summary judgment on Count VI (Section 1983 Retaliatory Termination under the Fourteenth Amendment) on the ground that Plaintiff has not put forward any evidence of causation. But Plaintiff's claim fails as a matter of law for a much simpler reason: in the Seventh Circuit, there is no such thing as an equal protection retaliation claim. *Boyd v. Illinois State Police*, 384 F.3d 888, 898 (7th Cir. 2004); see also *King v. Kramer*, 763 F.3d 635, 642 (acknowledging that "plaintiffs are not required to plead legal theories," but when a new theory entails "a jump shift" the complaint should be amended). Accordingly, Defendant is entitled to summary judgment on Plaintiff's Count VI.

Some of the briefing pivots to *First Amendment* retaliation, but the Court is skeptical that Plaintiff can make out a First Amendment retaliation claim on these facts. To make out such a claim, a plaintiff must show that the speech is constitutionally protected, that is, "that (1) he made the speech as a private citizen, (2) the speech addressed a matter of public concern, and (3) his interest in expressing that speech was not outweighed by the state's interests as an employer in

promoting effective and efficient public service." *Kristofek v. Village of Orland Hills*, 832 F.3d 785, 792 (7th Cir. 2016). "The Supreme Court has instructed that 'when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.'" *Id.* 792–93 (7th Cir. 2016) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)). Thus, an employee making internal complaints about other officers' misconduct pursuant to an anti-harassment policy is not speaking as a private citizen. *Roake v. Forest Preserve District of Cook County*, 849 F.3d 342, 346 (7th Cir. 2017) ("A police officer's duty to report official police misconduct is a basic part of the job.") And internal complaints about harassment intended to improve the employee's working conditions (as opposed to alerting the public) do not qualify as speech addressed at a matter of public concern. *Kubiak v. City of Chicago*, 810 F.3d 476, 482–84 (7th Cir. 2016). Here, where Plaintiff complained internally about intra-office police misconduct pursuant to internal policies and protocols, there is no indication that Plaintiff either spoke as a private citizen or directed his speech to a matter of public concern.

### 3. Jackson's Motion for Summary Judgment

Section 1983 suits are predicated on individual liability—that is, each individual defendant must have personally violated Plaintiff's rights to be liable under § 1983. *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017). Jackson claims that he cannot be held liable for any adverse employment actions because he was not personally involved in any discrimination. As explained above, there are two operative actions for which Jackson could be liable: the hostile work environment and Plaintiff's termination.

First, Jackson was not sufficiently personally involved in the hostile work environment to be subject to § 1983 liability. Preliminarily, there is no evidence that Jackson ever harassed

Plaintiff. And Plaintiff concedes that to survive summary judgment he must demonstrate "more than mere negligence on the part of" Jackson. [71 at 16 (citation omitted).] Even viewing the evidence in the light most favorable to Plaintiff, he cannot show that Jackson's post-2012 management was anything more than negligent: Jackson required harassment trainings and responded promptly when allegation of harassment did come across his desk in January 2016. Perhaps he should have done more, but there is nothing in the record suggesting that Jackson was anything more than negligent: there is no indication that Jackson knew of the third shift's hostility to Plaintiff or that some middle-managers failed to adhere to the harassment policy. All of the cases Plaintiff cites to the contrary are thus inapposite because they all acknowledge that a supervisor can only be liable in § 1983 when he is personally involved. See *Duchesne v. Sugarman*, 566 F.2d 817, 832 (2d Cir. 1977) (allowing a § 1983 case against a supervisor to go to a jury he personally promulgated an unconstitutional policy); *Hahn v. McLey*, 737 F.2d 771, 773 (8th Cir. 1984) (explaining that supervisory liability in § 1983 did not lie when defendants did not condone of constitutional violation—and, indeed, were not aware of it); *Taylor v. Mayone*, 574 F. Supp. 609, 614 (S.D.N.Y 1983) (implying that knowledge of an imminent constitutional violation is a prerequisite for supervisory § 1983 claims); *Williams v. Smith*, 781 F.3d 319, 324 (2d Cir. 1986) (refusing to grant summary judgment in light of factual dispute over supervisor's personal involvement). To the extent that these decades-old, out-of-circuit cases are relevant here, they all suggest that Jackson cannot be sued under § 1983, because he did not turn a blind eye to an imminent constitutional violation, was not personally involved, did not condone the harassment, and did not promulgate an unconstitutional policy.

Likewise, Jackson cannot be held liable for Plaintiff's termination. Indeed, the only things that happened before Jackson's retirement were (a) Plaintiff's interrogation in February 2016, and

(b) the release of the report concluding that Plaintiff's version of the facts were inconsistent with others. Jackson therefore was not responsible for ordering an additional investigation of Plaintiff, suspending Plaintiff, ordering further investigations into the Facebook incident, or ultimately firing him. It is not even clear that Jackson was personally involved with selecting the interrogation format and releasing the report; if not, he would not be liable under § 1983. *Colbert*, 851 F.3d at 657. Even if Jackson could be held liable for these actions, these two events did not, on their own, "'produce an injury or harm.'" *Lewis v. Wilkie*, 909 F.3d 858, 868 (7th Cir. 2018) (quoting *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006)); compare *id.* at 868–70 (holding that administrative errors, threats of future discipline, subjecting employee to surveillance, and requiring that employee submit to questioning in front of witnesses are not, without more, materially adverse), with *Robinson*, 894 F.3d at 833–934 (holding that increased surveillance, when combined with multi-pronged effort to end an employee's career, is materially adverse). To the extent that there is any evidence of greater surveillance of Plaintiff, let alone a conspiracy to end his career, it post-dates Jackson's retirement. Plaintiff's February interview involved no greater surveillance or investigation than it did of his coworkers; it was merely a questioning in front of witnesses, and thus not actionable under § 1983. *Lewis*, 909 F.3d at 868–90. Accordingly, Jackson cannot be sued under § 1983, and is entitled to summary judgment on these counts.

### 4. Monell

Defendant next argues that Plaintiff cannot proceed with his municipal liability claim. See generally *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). A *Monell* claim lies if Plaintiff's constitutional injury was caused by one of the following: "(1) the enforcement of an express policy of the [municipality], (2) a widespread practice that is so permanent and well settled as to constitute

a custom or usage with the force of law, or (3) a person with final policymaking authority." *Wragg v. Vill. of Thornton*, 604 F.3d 464, 467 (7th Cir. 2010) (citations omitted).

At the very least, Defendant has not demonstrated that, as a matter of law, Wilson was not a policymaker. "The determination of whether a person has policymaking authority is a question of state law and is to be decided by the court." *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 675 (7th Cir. 2009) (citation omitted); but see *Kujawski v. Board of Com'rs of Bartholomew County, Ind.*, 183 F.3d 734, 739 (7th Cir. 1999) (letting a sub-issue within the policymaker inquiry go to a jury). "In order to have final policymaking authority, an official must possess '[r]esponsibility for making law or setting policy,' that is, 'authority to adopt rules for the conduct of government.'" *Rasche v. Vill. of Beecher*, 336 F.3d 588, 599 (7th Cir. 2003) (quoting *Auriemma v. Rice*, 957 F.2d 397, 401 (7th Cir. 1992)). Although *Monell* policymaker liability is a question of law, it is highly data intensive: among other things, courts must consider "positive law, including ordinances, rules and regulations, [and] also the relevant customs and practices having the force of law." *Valentino*, 575 F.3d at 676 (citations omitted and internal quotation marks omitted). Courts must then marshal this data to determine, *inter alia*, whether the official's decision was subject to meaningful review and whether the decision was made within the official's grant of authority. *Id.* (citations omitted).

Defendant's argument is simple: the Seventh Circuit has held that in Illinois, police chiefs are generally not final policymakers with regard to hiring and firing. Rather, the city council generally acts as final policymaker. [65 at 22–23 (citations omitted).] "But to cite [these cases] for the proposition that the [city council] * * * is the final policymaker on every policy decision is to miss the fact that we look to various factors in determining whether a certain individual or group has policymaking authority on any particular policy decision." *Wragg*, 604 F.3d at 468.

Responsibilities such as policy-making authority regarding firing, can be delegated, *Kujawski*, 183 F.3d at 739, and Plaintiff cites to a town ordinance suggestive of such a delegation. [71 at 20–21.] In contrast, Defendant has marshalled no law or evidence on the specific question of whether police chiefs in North Chicago make firing policy. Thus, Defendant has not shown that it is entitled to judgment as a matter of law. With that said, the Court will discuss with counsel at the next status hearing whether the Monell claim (Count VII) should be bifurcated as a matter of prudent case management.

### 5. Discrimination Claim against Wilson

After all this winnowing, there is one more § 1983 claim left to deal with: Plaintiff's § 1983 discrimination claims against Wilson. Defendants concede that the "standards for proving discrimination under Title VII also apply equally to § 1983 claims." [65 at 21 (citations omitted).] As discussed above, a reasonable jury could conclude that Defendants fired Plaintiff in violation of Title VII. According to Defendants' own arguments, then, the § 1983 claim may proceed.

Next, Wilson argues that he is entitled to qualified immunity, because hiring and firing decisions are discretionary, and such discretionary decisions are not grounds for money damages "if they do not violate clearly established statutory or constitutional rights." [65 at 25–26 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)]. This argument in defense of qualified immunity, though, goes to questions of fact that need to be decided by a jury, such as the actual reasons for Plaintiff's discharge. [65 at 25–26.] Taking the facts and evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Plaintiff was fired for discriminatory reasons. "Arbitrary religion-and nationality-based discrimination had long been illegal" by the time that Plaintiff was fired, so firing him for those reasons was illegal under well-established law; Wilson

is not entitled to qualified immunity. See *Huri*, 804 F.3d at 835 (citing *Reed v. Faulkner*, 842 F.2d 960, 962 (7th Cir. 1988)). Thus, Wilson's motion for summary judgment on this count is denied.

### C.    State Law Claims

#### 1.    Retaliatory Discharge

Defendant argues that the common law retaliatory discharge claim should be dismissed as to both the municipal and individual defendants because all Defendants are immune. First, municipalities are *not* immune from Illinois tort claims based on retaliatory discharge. *Smith v. Waukegan Park Dist.*, 231 Ill.2d 111, 116–117 (2008) (finding that public employers may not invoke immunity in retaliatory discharge cases and overruling the case upon which Defendant relied). Thus, this claim against the municipality may proceed.

But, the retaliatory discharge claims against the individual Defendants cannot proceed. Preliminarily, Plaintiff did not respond to this aspect of Defendants' motion at all. But even if he had, the majority approach in Illinois state and federal courts applying Illinois law is to immunize individuals from retaliatory discharge suits. See *Consolino v. Dart*, 2019 WL 4450498, *10–11 (N.D. Ill. Sept. 17, 2019) (reviewing cases under the Illinois Tort Immunity Act, 745 ILCS 10/2–201); see also *Sroga v. Preckwinkle*, 2016 WL 1043427, *6 (N.D. Ill. March 16, 2016) (reviewing the common law on retaliatory discharge).

#### 2.    Illinois Human Rights Act Claims

Defendants concede that discrimination and retaliation claims brought pursuant to the IHRA are evaluated under the same standards and tests as those brought under Title VII. [65 at 27–28.] Because the Court denied summary judgment for the Title VII claims, Defendants likewise are not entitled to summary judgment on the IHRA claims as well.

### D.    Punitive Damages

Defendant objects to the request for punitive damages in (a) the § 1983 counts (V and VI) and (b) the IHRA counts insofar as they apply to the municipality. First, "a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983); see also *Alexander v. City of Milwaukee*, 474 F.3d 437, 454–55 (7th Cir. 2007) (upholding district court's decision to put punitive damages before the jury because the plaintiffs presented evidence that the defendants, accused of discrimination, "knew about a problem, failed to act to control it, as the responsibility of their office required them to do, and knowingly participated in its continuance"). Viewing the summary judgment record in the light most favorable to Plaintiff, a reasonable jury could conclude that Wilson acted recklessly with regards to Plaintiff's constitutional rights. Indeed, the framework of discriminatory termination suits, which require a showing that defendants either lied or fired the employee because of a protected characteristic, almost implicitly requires at least recklessness.

Second, neither party recites the proper standard for imposing punitive damages against the city in IHRA claims. Plaintiff ignores the argument, while Defendant cites a § 1983 case. See [65 at 29 (citing *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981) for the proposition that punitive damages cannot be imposed on municipalities "under the civil rights laws").] But § 1983 and the IHRA are different statutes. In any event, Illinois courts do not allow punitive damages in IHRA suits against employers. *E.g.*, *Stratton v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 2012 WL 1533456, at *2 (N.D. Ill. April 25, 2012) (discussing *Baker v. Miller*, 159 Ill.2d 249, 262 (1994); *Page v. City of Chicago*, 299 Ill.App.3d 450, 464 (1st Dist. 1998)).

IV.     **Analysis: Plaintiff's motion for summary judgment**

Plaintiff's motion for summary judgment on Counts I through VI of his complaint is denied. Plaintiff has failed to carry his burden of persuasion, and, in any event, to the extent that the claims survive Defendants' motion, each of the surviving claims is rife with issue of material fact that must be submitted to a jury. First, Plaintiff does not accurately describe the standard for summary judgment in his favor. According to him, "[t]he question is whether the evidence would permit a reasonable factfinder to conclude that a plaintiff's race or other impermissible factor caused the discharge." [58-1 at 3 (citing *Ortiz*, 834 F.3d at 765).] This is an accurate description of the standard when evaluating *Defendants'* motion for summary judgment, but the question is flipped when evaluating *Plaintiff's* motion for same: could a factfinder, viewing the evidence in the light most favorable to *Defendant*, reasonably conclude that the adverse actions were caused by a *permissible* factor? Here, Plaintiff makes no argument on that point, so his motion fails. Fed. R. Civ. P. 56(a). Moreover, as discussed above, there is contradictory evidence regarding why Plaintiff was fired and whether there was a hostile work environment. Viewing the evidence in the light most favorable to Defendants, a reasonable jury could well conclude that Plaintiff was not similarly situated to Florance; the justification for his termination was not pretextual; if there was pretext, it was unrelated to religion or national origin; that the harassment was neither objectively nor subjectively offensive; or the failure to contain the harassment did not constitute negligence.

V.     **Conclusion**

For these reasons, Defendants' motion for summary judgment [64] is granted in part and denied in part and Plaintiff's motion for summary judgment [57] is denied. The case is set for further status at March 3, 2020 at 9:00 a.m.

Dated: February 20, 2020

                                                    _____

Robert M. Dow, Jr.
United States District Judge